Our next case this morning is number 18-1863, Koninklijke KPN N v. v. Gemalto M2M. Our next case this morning is number 18-1863, Koninklijke KPN N v. v. Gemalto M2M. Our next case this morning is number 18-1863, Koninklijke KPN N v. v. Gemalto M2M. Okay, Mr. Healy. How do you pronounce the plaintiff's name? Is it Koninklijke? That's a tough one, your honor. Koninklijke? Koninklijke, but we just go by KPN. What did you say before KPN? Koninklijke. Oh, the J counts. Our client representative is actually here and speaks Dutch, so he may be able to help us if you have, but that's how we do it. KPN is probably the easiest way for the court. We'll go with that. Thank you, your honors. So, good morning, your honors. May it please the court. My name is Andres Healy. I'm here today on behalf of KPN. And for at least three reasons, the district court below... I don't think you guys did a great job in explaining this technology either side, which is a problem in these cases. So, what is the advantage of using scrambled original data here to do the checking? What's the advantage of that? Absolutely, your honor. Apologies for that. The advantage here is set forth specifically in the specification. For example, if you look in the summary of the invention, this is Appendix 71, Column 2, Lines 48 through 58. It expressly says, the invention is therefore based on the insight that an error which repeats itself, once not detected by a normal fixed checking function, will repeatedly go undetected. Could you explain, though, in basic terms why it is that permutating the data would solve that problem? Sure. So, in the prior art, your honors, the data is operated upon by the generating device. It's encoded, for lack of a better word. It's then transmitted to effectively the receiver. If there's some sort of electromagnetic interference... You're repeating the same check under the prior art, right? Correct, your honor. And the problem with this is if there is some sort of systematic electromagnetic interference, for example. So, there's a microwave in the office building. There's a TV. I guess the TV is a better example. It's always on. So, that electromagnetic radiation hits that transmitted sequence in the same spot every time. So, for example, if you have a sequence of 10 bits, it always hits bits 2 and 8. And it always hits those two bits. If you're always using the same encoding process, it's always going to hit the same two bits. The receiving end is never going to know there's a problem. If you are changing the bit position of those 10 bits... Why would the receiving end not know that there's a problem if there's just two bits, 2 and 8? Can you explain how that would happen? Why it would not know that there was a problem? Because it's going to happen every single time. So, for example, if you have a device, for example, your refrigerator that's always... Or your fire alarm is a good example. It's always pinging the network, no fire, no fire, no fire, no fire. If it always has the same error at each point, it's always going to get the same message. It's never going to detect that there's a problem. If you have... In contrast, in the innovation plan in the 662 patent, you now introduce this varying component to the computer. The varying component says you take the data, you change the bit position of some of the bits, and then in addition to... You use different check data for different transmissions, right? You can. And that is certainly the component set forth in the dependent claims where the... Which are all involved here, 2, 3, and 4. Correct, Your Honor. We disclaim Claim 1. I would say, certainly for the purpose of the record, Claim 1, in my opinion, and I think the claims bear it out, sets forth the overall architecture. It sets forth and describes the input, which is the binary data. It sets forth the order of operations of the various computer components. The varying device has to act first by permutating the bit position of at least some of the bits. It then has to provide that now buried data to the generating device. Okay, but you didn't really answer my earlier question, which is why scrambling the original data, which is what these claims require, is beneficial, as opposed to generating new data, which the specification recognizes as an alternative.  So, again, my apologies, Your Honor. With respect to that specific question, if the process is contemplated in the prior art, just a bit of background, is that you send not only the encoded data, so the supplementary check data, but you send the original data as well. And then that goes and is received by the receiver, which does a comparison. So if you always have this same formula going through and the electromagnetic interference hits them at the same point, that comparison check can result. That happens if you use the same data all the time, but why is it beneficial to scramble the original data as opposed to using new data? Right, and so the point here, Your Honor, is the scrambling of the data, you take the bit positions of at least some of those bits, you reorder them. So now when you're sending the data across the stream, you have the original data, you have now the reordered data. When that, again, assuming that there's this electromagnetic interference, it hits it at the same point, so in both sets of data, it interferes. I'm sorry, I'm not understanding why you're saying, what your explanation is to why scrambling original data is more beneficial than using new data. Is it because on the other end of the system, when you run it through, the original data that you sent has to be run through the function again to create the modified data that's compared to the modified data that was sent from the beginning? Is that why you wouldn't want to just send new data at the beginning of the system? Do you understand the question that's being asked? Apologies, I'm not sure I understand the sending of the new data. The specification talks about a random data generator as an alternative to scrambling the original data, correct? Yes, Your Honor. What is the benefit of scrambling the original data as opposed to using the alternative of generating new data? When you say generate new data, are you referring to the random number generator? Yes. Okay. The benefit is that it's the random number generator, for example, if you're using the parity bit function example, if you have an odd number of bits, the number that's added to the end would be a 1. If you have an even number of bits, it would be a 2. It's a more limited checking function. It allows for less capable checking. The varying of the bits, so for example, you have 10-bit stream, you change the bit position of bits 2 and 8, you send that generated, that's the supplementary check data, you send that across, it goes across with the supplementary or with the original data. At the receiving end, it can now compare it. It's going to go through the reverse of that process as contemplated in the process that existed in the prior art. And so now, if you, for example, you had that electromagnetic radiation and hit both streams, the original data and the check data at position 2 and 8, because you've reordered those bits when they become, you know, they're put back into their original formation, they're different. So there is now a much better way of checking because you have, you know, the scrambling of those bit positions effectively moves the bits and will mean that the electromagnetic radiation no longer hits them in the same spot. It may be me, but I'm not understanding what you're saying. Because if I understood correctly what you're saying, you're comparing the benefits of using scrambling data as opposed to the original data, which was not my question. Let me put it differently. Do these claims cover every way of checking for systemic errors that don't use the original data? No. Then why not? Well, for example, the prior art contemplates the parity bit method, which is not something that would be contained within the claims as set forth in the 662 patent. There's also the prior art contemplates the CRC method, also outside the claims. Frankly, the example Your Honor gave of Figure 2, the random number generator, not included within the scope of the 662 patent claims. An even more simplistic example is the claims of the 662 patent, particularly Claim 1, again sets forth a very particular input, output, and an order of operations to get from that input to output. Do I understand correctly you're not relying on Claim 1 in an appeal anymore? You are just relying on Claims 2, 3, and 4? I mean, you're not focusing on those. Do I understand that? We are not relying on Claim 1 as being independently – well, I should say, we're not relying on Claim 1 because of the fact that we have disclaimed it. I still think Claim 1 is important because it sets forth the structure and the architecture of this claim and provides the content. But we don't have to decide if Claim 1 is 101 eligible. You do not, Your Honor. However, again, obviously the dependent claims all depend from Claim 1, and so it provides context. Just to finish answering your question, Your Honor, with respect to, you know, does this preempt effectively all implementations of this? Again, the simplest example is if you were to just move the organization of the components, you have the generating device operate first, and then the interleaving device, the permutating device, operate, also not covered because, again, the Claim 1 architecture requires a specific order of operations. And so hopefully that answers your question, Your Honor. Can I see if I can try to articulate an understanding of how this claim convention works and maybe why there's an advantage? I mean, I think I agree with Judge Dyke that your brief proclaims over and over and over again, this is an advantage, this detects systemic errors, but it doesn't quite piece together why that is true by using permutation and then varying the permutation over time. It has an abstract quality. The brief. The brief. Maybe the claims too, but at least the brief. Thank you, Your Honor. So let's try to bring it down to brass tacks. Sure. The problem is that is with check data. Check data is supposed to be some representative value of the content of the data inside a given data block. But because it's just a shorthand value, shorthand label for all that data in the data block, it can't precisely describe all of the data because it's very shorthand. And so what that means is you could have a given check data value that corresponds to not only that particular data inside that given data block, but it also might correspond to other versions of data. And so, therefore, you can come across a problem in the data transmission where a given data block is corrupted in a particular way at particular bits, but still nevertheless generate on the back end, on the receiving end, the exact same check data value. And so to the error detection scheme, it will look like the data block has been transmitted cleanly because the check data values on the front end and the back end are equal to each other. And so if it's a systemic error, then what's going to happen is throughout your entire data transmission, block after block after block, you're going to have the exact same error. And the detection scheme is not going to be able to figure that out because of the limitations of check data values. Right? Correct. Okay. So what you've done is you've decided you're going to permutate the data, the original data in each given data block. And then you're going to vary that permutation, maybe not for every single block, but for several blocks in a given stream of data block transmissions. And by varying the permutation, even if the first permutation doesn't capture and reveal the persistent error, because it still ends up generating the exact same check data value on the back end, by varying the permutation at other given data blocks, you're eventually going to come up with a variance in the data that will reveal the error and not keep it concealed. So at some point in time, you're going to figure out, aha, we've got an error here. Is that how the claimed invention works? I would say at a high level, yes, Your Honor. And I would say that the examples you gave certainly get into some of the further downstream of the dependent claims, but in a general sense, yes. Right. Well, when you say at a high level, I mean, to me, that's a lower level than whatever level your brief was at. Understood. Understood. Okay. So can you tell me what's going on with Claim 3? Claim 2, you have a theory where you're varying the permutation over time. And I assume that means for successive data blocks, you're using different permutations, different methodologies of switching the bits around, scrambling the data. But I don't understand Claim 3. So Claim 2, Your Honor, the claim construction is from time to time. And, yes, it would allow for the capability to change the permutation that the varying device is applying. Claim 3 is that you're changing that permutation based on the original data. So as described in the specification, that can be… Can you give me an example? Sure. The number of bits is the simplest example. If the input data block has 50 bits, it receives this permutation. If it has 100 bits, it receives a different permutation. The specification, I think this is at columns 5 and 6, also describes other examples. For example, it can be based on an index. It can be based on other qualities of the data itself. Why would that matter? Oh, if it's 20 bits, use this permutation. If it's 50 bits, use that permutation. Why would that be an inventive concept? Why would it be an inventive concept? I guess, for us, why it would be an inventive concept, I would rely on the spec. Just to take one step back, a lot of the questions about the utility of this invention, does it actually do what's promised? Does it actually confer the benefit that it states that we… But what benefit is conferred by using a different permutation based on the length of bits in a given data block? What's the benefit? What's the technical benefit? I mean, number one, the technical benefit would be, and again, the entire context of what we're claiming is a component of it. Isn't the simple answer that if Claim 2 is patent eligible, since Claim 3 incorporates Claim 2 as a dependent claim, it's patent eligible too, even if it doesn't add anything that's an inventive concept to Claim 2, right? Absolutely agree with that, Your Honor. But your brief attempted to argue there was an independent reason for why Claim 3, aside from Claim 2, is patent eligible. And I don't understand it right now. You've got 15 seconds to tell me what's the answer. Sure. Again, the overall system contemplates that there be both a receiving end and a transmitting end. What's the inventive concept that Claim 3 adds to Claim 2? Assuming, let's assume for a minute that I agreed with you on Claim 2, then you have nothing else to add for Claim 3. But if I don't agree with you on Claim 2, how are you going to convince me that Claim 3 adds something that makes it an inventive concept? Sure, and I apologize. I'm trying to answer that. It's the same question. I'm asking the same thing. When you're basing your permutations on the characteristics of the original data, that allows for there to be a similarity and for both the receiving and transmitting end because it's based on the characteristics of the data. The data is going to be the same at both ends. That is where the benefit comes in. You now are allowing for what the patent recites and the specification describes is that added benefit conferred when both ends are using the same permutation structure. If that's satisfied by Claim 1 or Claim 2, that they're using the same permutation device at the beginning and the end, Claim 3 is just talking about how the permutation device itself is going to be based on the original data. The permutation applied is based on the original data in Claim 3. So wait a second. You're telling me Claim 3 is specifically calling for the same permutation to be done at the sending end and the receiving end. That's all Claim 3 is calling for? I'm saying that Claim 3 requires that the permutation applied be based on the characteristics of the original data. One of the examples of that is if you, for example, have a block that has a set number of bits, because now you're determining what permutation formula in the manner in which you're going to permutate based on those characteristics, now you're incorporating and bringing in the fact that both the receiving and the transmitting end are going to apply the same formula or can apply the same permutation formula to those bits. Would you want to always use the same permutation formula when you're doing this kind of error check? I think that would be the best case scenario, yes, Your Honor, which is why we think Claim 3 introduces and maintains that inventive concept. All right. Anything more? All right. Thank you, Mr. Healy. Mr. Rosenthal? Good morning, Your Honors. May it please the Court, my name is Brian Rosenthal on behalf of the appellees. I want to start before I sort of get into some of those technical questions, which are great, just by emphasizing one thing, and that is that the focus of the 101 analysis has to be on the claims and not on the specification. Okay, but why don't you proceed for the moment on the theory that we reject your argument that the claims are not directed to error checking, and your argument is that it just talks about the generation of data. But let's assume that it contemplates the generation of data for the purpose of error checking. Why are these three claims 101 and eligible? Yeah, so we do not rely on the argument that they're divorced from error checking. They certainly, as they're construed for purposes of this motion, talk about generating additional data for use in error checking. So we have no problem with that. Why are they ineligible? The answer to that question is found by looking at the language of the claims themselves. And if you look at Claim 1, from which Claims 2 through 4 depend, and really this is the beginning and end of the analysis as far as I'm concerned, there are three elements of the claim. There's a generating device that is configured to generate check data, and that has been, for purposes of this analysis, construed to mean generate supplemental data for use in error checking. Check data means, right. And check data, you know, we know what that means. It's for use in error checking. Let's assume that that's correct. That's the argument that KPN is making. And then, this is very important, the varying device varies the original data and supplies that varied data to the generating device. Now Claims 2 through 4 talk about how do you do that varying, but they don't otherwise change the structure of the claim. Well, but Claim 2 adds something important, which is that the varying device modifies the permutation over time. That is, it uses different checks at different times for different blocks of data. Not different checks, but different permutations, absolutely. It performs different permutations on the data at different times. Which has the advantage of checking persistent systemic errors, right? Actually, there's nothing in the patent that talks about why that's an advantage at all. The only description in the patent about varying the permutation over time is contained in a single sentence, at the bottom of Column 5 and the top of Column 6. It says nothing about why that's useful, and I don't know why it's useful. Because when you're permutating the data, there's nothing in the patent that says that somehow the check data will be any different by permutating the data before you generate it. But the fundamental reason why these claims are ineligible is because there's no connection in the claim between the permutated data and the generated additional data. There's nothing in this claim that says, or implies, or has been construed to say, that the varied data is in any way used to generate the additional data. Did Fred Stark say that? Yes, he did. He said that there's nothing in the claims that tells you how to use the reordered data in any way. And I can give you a citation for that, but it's in the middle of his opinion. The question is... I'm sorry. Oh, okay. I guess we have to... I mean, what you're asking for is a claim construction right now. I think you are, because there's a counter-claim construction that when you read this claim in the context of this patent, the generating device configured to generate check data, the output that it's generating, the check data, is based on a certain input. What is that input? It's the input coming out of the varying device that varies the original data based on a permutation, and that permutation can change over time, over the course of a series of different data blocks. So I understand your argument, which is I don't see actual words that say, take all of that varying data that you're generating in this claim and plug it into the generating device to generate said check data. But the claim, at least the preamble, says you're producing error checking based on original data. And then this claim talks about taking original data, varying that original data based on a permutation, and then ultimately a generating device to generate the check data. I think there's a logic inside the claim that you're taking that original data, which is what is needed to generate check data, and then you're doing all these manipulations based on different varying formulas to manipulate to generate the check data. So I guess for now, let's just assume that that's a plausible reading of the claim. I understand your position, or at least one of your positions, is it's not a correct reading of the claim, but let's assume for the moment it is. Then where do we go? Okay, so first of all, the claim is still ineligible, and I'm going to explain why. I do want to direct your attention to Appendix 656, which is where at the oral argument counsel stated in response to a direct question from Judge Stark, do you need these claims to be construed? And the answer was no, we don't need to get there. And there is nothing in the language of the claims or in the construction that says the logical interpretation that you say is plausible. It may be a plausible interpretation. We're not arguing claim construction here because no claim construction issue was ever raised, and counsel said that we're not arguing claim construction. Nobody argued that these claims could be interpreted as 112-6 paragraph claims? No. But my understanding is the entire premise of their argument, the other side's argument, has always been about the importance of varying the original data according to various formulas and then producing checked data based on that very original data. So that is an articulation of a conception of what is going on inside these claims. You're right, Your Honor. And so I don't know, without doing a formal claim construction, why or how that particular conception of this claim, which to me doesn't sound crazy, should be dismissed out of hand. I don't disagree that it doesn't sound crazy. What I disagree is that KPN has ever argued that that's how the claim should be construed. But how are we supposed? Are we supposed to just not interpret the claim? Are we just not supposed to try to understand what it means as we make an assessment of whether the claim is eligible? I think that you're wrong. They probably didn't say, don't interpret this claim at all. I think they probably said you can give its plain and ordinary meaning, meaning that you don't have to interpret the claim. Not really, but almost. What the parties actually said is that there were constructions which KPN sought and obtained in a different case against Samsung. And we said, let's use those constructions because they must be the most favorable. And in your opinion in content extraction, this court has said it's appropriate to give the claims the most favorable meaning. How would those constructions bear on what we've just been talking about? Well, those constructions, when you read the language of those constructions, nowhere add to the claims the logical interpretation that Judge Chen was saying could be an interpretation that there's a connection between the reordered data and the generated additional data. Can I make sure I understand your position? Yes. I understand you to be saying that because the claim says a varying device to vary the original data prior to supplying it to the generating device, and it says there's a generating device configured to generate check data, that one of ordinary sconyard would not understand this claim to mean that that varied original data is the thing that the generating device is operating on to generate the check data. I'm not making that claim construction argument. What I'm saying is that nothing in the claims that's construed by the Samsung court, which the parties have been operating under for this motion, says that. But, you know, new different litigations, new patent law issues that the courts are presented with might raise a new claim construction requirement, right? It might require that you have to understand a claim term. Sure. Suppose we were to say, I know you don't like the notion that the claim would be construed the way Judge Chen was suggesting, but let's just hypothetically assume for the moment that we engage in that claim construction on appeal based on the evidence, and we reach that claim construction. Why under that claim construction are the claims 2, 3, and 4 patent ineligible? Very good. So under that claim construction, they're still ineligible because they do nothing more than take data, reorganize it, and then generate additional data. Now, the new data may well be based on the reordered data under this claim construction, right? But then they simply say it's for use in error checking. And the reason that that claim is still ineligible is for the same reason that the claim was ineligible in the content extraction case or in Digitech or in any of the other cases, in which all the claim does is take data, reorganize it, put it in a different form, and then say use it. Take it one step further. Let's assume we reject that 2, okay? And that what we say is that the claims here cover generating this permutation and using it for error checking, and that it's required by claim 2 that there are different iterations of the checked data from one time period to another, okay? And that the benefit of that is that it enables to find systemic errors that you wouldn't want. But let's assume that that's the case. Why is that patent ineligible? Well, because it's still, even with all of those assumptions, the claims actually never put to use the data that they generate. Now, I'm not saying that a patentee has to claim an entire system in order to have a concrete eligible invention. However, the thing that the patentee... Let's say, hypothetically, the claims did tell you to put the data to use for error checking by varying it from one time period to another in order to check for systemic error. Let's suppose that this thing were clearly written to say all of those things. Would that be patent ineligible? I think if the claims were written to cover what's actually described as the invention in the patent, which is doing what you just said on both sides of a transmission and then comparing the results to determine whether an error has occurred, I would not be standing up here with the same argument. Here's my concern with that response. It seems intuitive that you ought to be able to patent an improvement to a particular device in an overall system rather than be forced to go further and claim the entire system with one of the claim elements being the improved device. And so here, why isn't there an argument that this check data generator device, that's what the claim is directed to, is an improved check data generator device in the sense that this particular check data generator device can now give you or give the system an important new tool to uncover systemic error through the variance of the permutation formula. And so thanks to the power of software, what we have is a device that's something of a shapeshifter. At block one, it uses permutation formula one. At block seven, it's going to use permutation formula number seven. And so on and so on in such a way that now you're going to figure out the systemic error that keeps repeating through all of the data blocks. So what we've got here is arguably a shapeshifting check data generator. Your Honor, if they had claimed that dynamic error check generator in some kind of an application, we would be dealing with a different case. What does that mean by in some kind of application? Because why can't you just claim the features of your improved device, full stop period, don't go further and say, and then now I'm going to convert my device claim into a method claim because now I'm going to then recite all the steps of how this device gets used in an overall system. You absolutely can do it as long as the thing that you are claiming is itself a concrete invention. And if I may analogize, I think it was the Diamond v. Deere case a long time ago, was the case about using a mathematical formula for curing rubber. And in that case, the Supreme Court said that that was a patent eligible claim because they talked about how you use the mathematical formula in the process of curing rubber. Now, if they had instead written a claim that said, cure rubber using this mathematical formula, I think we would all agree that that is not a patent eligible invention because they have not described how to use this abstract idea other than simply say, put it in this context. What if, though, we think that the claim does describe how you generate the error check data? It doesn't explain how you do the comparison at the end, but it does explain how you generate the error check data. To me, that is not concrete enough under this court's precedent. Because under this court's precedent, Digitech content extraction, the Capital, well, let me leave it at those, or the Capital One financial case, the intellectual ventures case, and several others, all of those cases talk about taking data, manipulating the data, generating additional data, putting it in a new form. I'm reminded of the court's decision in Digitech. And in that case, this is what they said. Nothing in the claim language expressly ties the method to an image processor. This was about creating a device profile. I'm not sure if the facts are, let me talk about the facts for a moment. In that case, there was a claim that said, take all of this data from one source, take all of this data from another source, combine them into a device profile. And the specification talked about how important that was in then doing image processing. This court said that the claim generically recites a process of combining the two data sets into a device profile. It does not claim the processor's use of the profile in the capturing, transforming, or rendering of a digital image. And the point that the court was making is the same point that we are making here, which is that just explaining, if the court agrees. It sounds to me as though what you're saying is that there is a patent-eligible invention here, but they did a bad job of writing their patent claims to cover it. I couldn't have said it better, except that I would probably say there may be a patent-eligible invention here, because I'm a lawyer. But I totally agree, Your Honor, that had they claimed something that is actually what's described as the innovation, as the technological solution, had they done that, we would be in a very different situation. And one of the things that might be different between this case and the case that you just described is that error-checked data has a very well-known meaning to one of ordinary skill in the art. Well, error-checked data may well have a well-known meaning, but the only thing that this is doing, so too does device profile in the Digitech case. I don't know if device profile has a well-known specific meaning. Device profile could have very different meanings depending on what device you're talking about. My refrigerator is a device that could have a profile. On the other hand, error-checked data is something that always relates to a communication field, and the sending of data from one point to a destination and seeing whether there is error in that communication. It's pretty narrow. Well, let me take as a given that that's true. I'm not sure I agree with that, but even if that were true, to me, the answer doesn't change as to eligibility, because all you have done with this claim is describe, and it's a device, but that doesn't do anything. It's a method that is implemented on generic hardware to do the following. Take input data, reorder it, generate additional data for use in error-checking. How do you use that error-checked data? Should you be doing the comparisons against both? All of that stuff is absolutely absent from the claim. It is simply generating data, and the language that they hang their hat on, that it's for use in error-checking, that does no more than place this in a technological context, which the Supreme Court said in Alice was insufficient. It's not sufficient to simply say, when you generate this data, use it for error-checking somehow. That's not sufficient, according to Alice, to simply say, do it in some environment. I'm not sure what my time situation is. You're out of time. I am. Okay. All right. Thank you very much. Mr. Healy, we'll give you a couple minutes, two minutes. I want to push back on the last point that Mr. Rosenthal just said, which is that the description for use in error-checking is just an intended use. We specifically incorporated that claim construction in the body of the claim to describe the characteristics of the data that needed to be produced. It's not very well written. These claims are not really well written, right? Your Honor, I was not involved in the prosecution. I certainly could agree that they could be written in a better way, perhaps. They're originally in Dutch, and I think there may be a translation issue there. But the core point is this is not an intended use of this statement. This describes the specific output that's required, which makes it a more concrete invention. I also want to talk, just respond, the advantage of the varying device. Your Honor, I think your analogy is apt. If KPN had invented a better brake pad, one that had better withstood, you know, temperatures better, had longer longevity, the fact that it didn't claim the car to incorporate that brake pad and the fact that it didn't incorporate stopping the car does not mean that the invention that was claimed, this concrete specific device that's contemplated, certainly to be incorporated into a larger system or process or vehicle in order to realize that benefit, doesn't mean that it's not a better permutating device, and that's what exactly is claimed here. And I think with respect to the benefit to be realized by this, again, the specification makes clear that the benefit is specific to the permutating device. There's not this overarching need to incorporate it into a larger process in order to absolutely realize that. And again, I would refer the Court to Appendix 71, Columns 2, Lines 48 through 58. It says expressly, the invention is also based on the insight that a variable checking function can almost always prevent the non-detection of repetitive errors. A further aspect of the invention is based on the insight that the varying of the checking function can be advantageously based on the data to be checked. That's Claim 3. And that the varying of the data can be used to accomplish a varying, i.e., time-dependent checking function. That's Claim 2. Mr. Healy, I think we're out of time. Thank you. Thank you, Your Honor.